STATE OF NORTH CAROLINA v. FRANKLIN W. DAIS

No. 748SC413

(Filed 17 July 1974)

1. **Criminal Law § 101—conduct of prosecuting witness and father — effect on jury — mistrial properly denied**

   In a prosecution for assault with intent to commit rape and for felonious breaking and entering, the trial court did not err in denying defendant's motions for mistrial based on the allegedly prejudicial conduct of the prosecuting witness and her father where the evidence tended to show that the prosecuting witness began to cry and sob, the trial court granted a recess for the witness to regain her composure, during the recess the witness's father assaulted defendant while the judge and several jurors were present, and after the recess the judge told the jury about the entire incident, asked the jurors if they could render a fair and impartial verdict uninfluenced by the incident, had the jury polled, and removed the only juror who indicated that his verdict might be influenced.

2. **Rape § 18— assault with intent to commit rape — instructions proper**

   Trial court's instruction on assault with intent to commit rape was not improper by reason of the fact that the words "at all events against her will and notwithstanding any resistance she may make" were omitted.

APPEAL by defendant from *Godwin, Special Judge,* 17 December 1973 Session of Superior Court held in WAYNE County.

Defendant Franklin W. Dais was indicted for assault with intent to commit rape and for felonious breaking and entering.

Evidence for the State tended to show the following. About 1:00 p.m. on 16 March 1973, defendant drove into the yard in front of a trailer occupied by Brenda Diane Griffin. When Griffin answered defendant's knock on the door, defendant asked whether she knew a Mr. Parker. After Griffin replied in the negative, defendant returned to his car, a green Rambler station wagon with a Goldsboro city tag on the front, and drove away. About 2:30 p.m. while doing household chores, Griffin heard bumping noises under the trailer. Shortly thereafter, when she "went to the back door to get [a] load [of clothes] off the line," defendant "jumped in" and "grabbed" her just after she had opened the door. Griffin attempted to run, and a scuffle ensued. Defendant repeatedly told Griffin "he was going to get" her. Although Griffin attempted to fend defendant off with her hands, as well as by pushing and kicking him, he continued to hold her around the waist and forced Griffin down the hall into

a bedroom. Before defendant put his hand over her mouth, Griffin screamed several times. Defendant threw Griffin onto a bed, removed the dungarees she was wearing and "tore off" her underwear. Griffin continued to struggle, but defendant kept pushing her down. After lowering his trousers, defendant told Griffin that "he was going to kill [her] if he didn't do it." Although defendant straddled Griffin who was still struggling, he did not have sexual intercourse with her. Griffin heard her husband's truck drive up and began screaming louder. Defendant "jumped up and left." Mrs. Griffin's husband came in, saw defendant, chased him around the trailer and began fighting with him. Defendant escaped out the back door, shutting it on the husband's arm. Griffin denied giving defendant permission to enter the trailer or to touch her in any manner. After defendant left, Griffin noticed some scratches on her leg and back which were not present before the fight with defendant. Almost immediately after the attack, she was examined at a local hospital and given some medicine "to calm her down."

The State also offered evidence that on 16 March 1973, Faison Williams, a mechanic, was road testing an automobile and observed a green Rambler station wagon in front of the Griffin trailer. A man who looked something like defendant was in the yard. Later, while testing another vehicle, Williams noticed the same green Rambler parked on the side of the road about 100-150 yards from the trailer. The hood on the Rambler was "approximately half up." Williams was employed with Mr. Griffin and knew where he lived. After being informed of what Williams had seen, Mr. Griffin went home to investigate.

Henry Poole, an SBI agent investigating the alleged assault, testified that defendant had made a statement to the effect that "he . . . crawled under the trailer from the front steps to the back; that . . . at the back a girl opened the door;" that "he didn't know why but he jumped the girl and forced her back into the trailer;" that "while he was in the trailer the girl's husband came home and caught him in the trailer but that he ran out and got away and returned to his car, turned around and left the area."

Testifying in his own behalf, defendant admitted being at the Griffin trailer twice on the afternoon of 16 March 1973. Defendant also acknowledged that his car, a green Rambler station wagon, was parked on the side of the road that after-

noon. He claimed he parked it there when the vehicle's temperature needle registered "hot." Defendant explained that he raised the hood, checked the radiator, waited for it to cool down, removed the radiator cap and determined that "the car . . . needed some water." Defendant left the "hood raised halfway up" and went back to the Griffin trailer in search of water. He saw a can halfway under the trailer and crawled under to retrieve it, intending to use it to carry water. After discovering that the can had a hole in it, defendant knocked on the back door of the trailer. When Griffin answered, she told defendant "to come in . . . 'maybe we can find something for you' " to put water in. Defendant described the ensuing events as follows:

> "I went in the back door and I noticed immediately inside that wall and we turned left towards whatever portion of the house it was. We walked toward the front end of the trailer. I think it was the hall portion. Mrs. Griffin was about three steps in front of me.
>
> At that point I had not come in physical contact in any way whatsoever with Mrs. Griffin. At that point Mrs. Griffin had said nothing to me about leaving her premises. When we got to the front portion of the hall she turned and asked me if I was the boy that had come earlier and I said 'Yes, ma'am' and she told me I was lying and I said 'No, ma'am'. At this point I did not have any physical contact with her whatsoever.
>
> After she made that statement she laughed and said was it something there that I wanted or if it was her that I wanted. I said, 'No, ma'am' and headed back toward the back door. At this point I had had no physical contact with Mrs. Griffin of any kind whatsoever. As I was backing back I tripped and fell backwards on my bottom. At that point Mrs. Griffin did not say anything to me but I heard a sliding noise. It came from the rear and when I heard the noise I jumped up and I ran to the front door of the trailer trying to get out of it. I think I pushed Mrs. Griffin going to the front door but other than that I had no physical contact with her. This happened in the upper portion of the hallway."

Unable to open the front door, defendant ran towards the back door and in so doing "passed some guy, a male person." Defendant denied scuffling with the man before running out the back

door. Defendant stated that he removed the Goldsboro city tag from his car after his visit to the Griffin trailer because the tag would not stay in place.

Several witnesses testified that defendant's general reputation in the community is good.

Upon a verdict of guilty of both offenses, defendant was sentenced to a prison term of 15 years for assault with intent to commit rape and to a term of 4 years for felonious breaking or entering. The sentences are consecutive.

*Attorney General Robert Morgan by Thomas M. Ringer, Jr., Associate Attorney, for the State.*

*Herbert B. Hulse and George F. Taylor for defendant appellant.*

VAUGHN, Judge.

[1] Defendant contends that the court erred in denying his motions for mistrial. The motions were precipitated by the following events. While her husband was testifying, Brenda Griffin began to cry and sob. To afford Griffin an opportunity to regain her composure or to leave the courtroom, the court declared a short recess. Before the recess was announced, Griffin's father, Walter Walston, came into the Bar, at the assistant solicitor's suggestion, sat down by Griffin and put his arm around Griffin. The court subsequently determined that Griffin would not soon regain her composure and declared a recess for lunch until two o'clock. As defendant and others were leaving the courtroom but while the judge and several of the jurors were still present, defendant was assaulted or "set upon" by Walston. Griffin eventually left the courtroom with her husband and left the vicinity of the courthouse in an ambulance. Several jurors saw the ambulance, and at least one saw Griffin leave in it.

After the noon recess, the judge told the jury about the physical attack on defendant and explained defendant's and the State's right to a fair and impartial trial upon evidence presented at trial. The court then made the following request of the jurors:

> "Now, you will say when your name is called, please, either yes that you feel that you can and will render a fair and impartial verdict uninfluenced by the incident men-

tioned, a verdict based entirely upon the evidence and in accordance with law or you will answer no if you will that the incident is likely to have any influence on your verdict in any respect. Poll the jury, please, ma'am."

All jurors indicated to the court that they could render a fair and impartial verdict notwithstanding the incidents.

The court discussed Griffin's departure from the courthouse with the jury. The court also mentioned Griffin's display of emotion prior to the recess. In an effort to determine whether the jurors could still function impartially, the court said,

" . . . I'm anxious to know what you have to say about that now, and I would broaden the question to include any, all and every incident that you may have observed or which may have come to your attention in any respect. I will inquire of you if you feel that notwithstanding any incidents that you have, may have observed, whether mentioned by the Court or otherwise is likely to have any influence on your verdict; if you still feel, all thirteen of you that you can and will return a fully fair and an impartial verdict, that is a verdict that is fair to the State, that is fair to the defendant, that is impartial in all respects, a verdict based upon the evidence and in accord with law. I want to know from you if you feel that you can do so notwithstanding any incident mentioned by the Court or that has otherwise come to your attention and I will ask those of you who feel that you can do so, that is that you can render a fully fair and impartial verdict based upon the evidence and in accord with law to hold up your hands, please, so that you may be counted. . . . "

The only juror who indicated the incidents might affect his verdict was removed. The alternate juror was substituted, and the court proceeded to ask the jury as it was then constituted if it could "firmly and sincerely say . . . that [it] can and will return a fair and impartial verdict both for the State and for the defendant . . . a verdict based entirely upon evidence. . . . " All the jurors responded affirmatively.

Defendant argues that "these incidents separately, and without question, in the aggregate, created conditions of bias and prejudice requiring a determination by the court, as a matter of law, that the proceedings could not continue with fairness to the defendant."

Motions for mistrial precipitated by "misconduct affecting the jury are addressed to the discretion of the trial court." *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190. *See State v. Shedd,* 274 N.C. 95, 161 S.E. 2d 477, *quoting* 2 McIntosh, N. C. Practice 2d, p. 67. Not every disruptive event occurring during the course of the trial requires the court automatically to declare a mistrial. *See* 46 A.L.R. 2d 942-63. Ordinarily, the manner in which a trial is conducted rests in the discretion of the court, "as long as defendant's rights are scrupulously afforded him." *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729. This principle applies to control by the court of the conduct of spectators during the course of trial. *See State v. Laxton,* 78 N.C. 564; 53 Am. Jur., "Trial," § 42, p. 55. A mistrial, however, must be ordered where it appears that such conduct undermined the jury's impartiality. *See State v. Shedd, supra; State v. Sneeden, supra; State v. Moye,* 12 N.C. App. 178, 182 S.E. 2d 814; 53 Am. Jur. "Trial," § 42, p. 55. In the present case, the court carefully examined the jurors to ascertain whether the incidents in question would undermine their ability to render an impartial verdict based only upon evidence presented at trial. *Compare State v. Moye, supra.* The court dismissed the only juror who admitted the possibility of bias. The trial court also made it clear that the jury should not consider the incidents in reaching a verdict. The court promptly took steps to insure that the duration and impact of the disruptions were minimized. Court was recessed when Griffin did not immediately regain her composure. To reduce the risk of rumor and distortion, the court elected to inform the entire jury of the attack on defendant even though only a few of the jurors had witnessed it.

Defendant cites the decision in *State v. Canipe,* 240 N.C. 60, 81 S.E. 2d 173, in support of his position that the court should have declared a mistrial. In *Canipe,* the possibility of prejudice arose as a result of comments made by the court during the selection of the jury. The comments were characterized as having "a logical tendency to implant in the minds of the trial jurors the convictions that the presiding judge believed that the prisoner had killed his wife in an atrocious manner, that the prisoner was guilty of murder in the first degree, and that the prisoner ought to suffer death for his crime." After the jury was impaneled, the court stated, "I do not have any idea that anybody could possibly believe that the court was comparing the Greenlease case and the case of the murder of the American soldiers with this case. . . [b]ut in order to be sure that the

defendant has not been prejudiced because of those questions, I would like for you to let me know now if anyone on the jury got the impression that the court was comparing this case to any other case. The defendant is entitled to a jury with no prejudice. . . . " In essence the Supreme Court held that this procedure did not effectively insure defendant's right to trial by the impartial jury. The Court observed that in order to be excused, jurors had to meet two conditions: (1) acknowledge in open court that their minds were biased against the defendant and (2) in substance, accuse the presiding judge of instilling the bias. We conclude that the decision in *Canipe* is not controlling on the issue of whether the court's questioning of the jury was an appropriate means of evaluating the possibility of actual prejudice. The trial judge in the case at bar did not express any opinion as to the guilt of the accused. The possibility of improper influence did not result from comments by the judge but from the conduct of others. Thus, the jurors were not called upon to tell the judge that *his* conduct had prejudiced them. We are confident that the able and experienced trial judge did not rely entirely on the spoken words of the jurors as he exercised his discretion. He could make his own evaluation of the seriousness of the disturbances that took place at trial and judge the probable effect, if any, on the jury. We hold that no abuse of the judge's discretion has been shown.

[2]   Defendant contends that the court incorrectly stated the law with respect to assault with intent to commit rape. The judge charged as follows:

> "In order for the State to be entitled to a verdict of guilty of assault with the intent to commit rape as charged in that bill of indictment the State must satisfy you from the evidence and beyond a reasonable doubt of two things: 1. That the defendant, Franklin W. Dais assaulted Brenda Diane Griffin; that is that he put his hands on her and drug her into a small bedroom in her house trailer and removed her clothing without her consent; 2. The State must also satisfy you that he intended to use whatever force might be necessary to have sexual intercourse with her notwithstanding any resistance that she might make.
>
> *   *   *
>
> Intent to commit rape is the intent to use whatever force might be necessary to have sexual intercourse, in this

case with Brenda Diane Griffin notwithstanding any resistance that she might make."

Defendant seems to argue that it was error for the court to fail to say "at all events against her will and notwithstanding any resistance she may make." We do not agree. If defendant "at any time during the assault, had an intent to gratify his passion upon the woman, notwithstanding any resistance on her part, the defendant would be guilty of the offense." *State v. Hudson*, 280 N.C. 74, 185 S.E. 2d 189. The omission of the words "at all events against her will" did not constitute prejudicial error.

We have considered defendant's other assignments of error and the same are overruled. Defendant, represented by able counsel, had a fair trial free of prejudicial error.

No error.

Chief Judge BROCK and Judge MORRIS concur.